**WESTVACO CORPORATION,**
Plaintiff–Appellee,

v.

**UNITED PAPERWORKERS INTER-NATIONAL UNION, AFL–CIO, on behalf of its affiliated LOCAL UNION 676, Defendant–Appellant.**

No. 98–1601.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 29, 1999.

Decided March 25, 1999.

Reversed and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge LUTTIG and Judge TRAXLER joined.

## OPINION

WILKINSON, Chief Judge:

Mark Ravenscroft was fired from his job at Westvaco Corporation for sexually harassing a co-worker. He grieved his discharge and the matter was arbitrated pursuant to a collective bargaining agreement between his union and the company. The arbitrator imposed upon Ravenscroft a nine-month suspension without pay. Westvaco then filed suit challenging the arbitral award. The district court found that Ravenscroft's reinstatement after nine months violated the public policy against sexual harassment and vacated the arbitral award. By so doing, the district court improperly substituted its own judgment for that of the decision maker contractually selected by the parties—the arbitrator. Because the arbitrator acted within his authority and the award did not violate public policy, we reverse and remand with directions to reinstate the arbitral judgment.

### I.

Mark Ravenscroft worked for Westvaco for nearly twenty years before his discharge on January 10, 1997. His termination was prompted by a sexual harassment complaint filed by a co-worker, Jacquie Shreve. Shreve complained to the company that Ravenscroft called her at home and left a message consisting of heavy breathing and panting or slurping sounds. Ravenscroft ended the message with the words "Love you, baby."

In response to Shreve's complaint, Westvaco conducted an investigation. The company learned from Shreve that despite her objections, Ravenscroft had addressed her for the past year as "foxy mama" and "foxy lady." In addition, Ravenscroft

**ARGUED:** James J. Vergara, Jr., Vergara & Associates, Hopewell, Virginia, for Appellant. Clinton Stephen Morse, Flippin, Densmore, Morse, Rutherford & Jessee, Roanoke, Virginia, for Appellee. **ON BRIEF:** Todd A. Leeson, Flippin, Densmore, Morse, Rutherford & Jessee, Roanoke, Virginia, for Appellee.

Before WILKINSON, Chief Judge, and LUTTIG and TRAXLER, Circuit Judges.

would visit Shreve's office and stare at her for periods of ten to twenty minutes. When Shreve objected, Ravenscroft would either deny that he was staring at her or ignore her objections. Matters escalated in November 1996. After helping Shreve carry a box of candy from her car, Ravenscroft asked for a kiss. When Shreve refused, Ravenscroft stated, "I am serious, I want some tongue." Shreve asked him to leave, and he did. Later that day, Ravenscroft observed Shreve bending over and commented, "Oh, nice position, Jacquie." Shreve told the company that she did not report Ravenscroft earlier because she did not want to "make waves" and she thought she could handle the problem herself.

Westvaco officials met with Ravenscroft on January 10, 1997. He admitted most of the behavior but professed that he intended no harm. He stated that he did not understand the severity of his actions and pledged not to bother Shreve or any other female employee. Based upon these admissions, the company determined that Ravenscroft violated the company's sexual harassment policy. That policy forbids "sexual harassment of any sort" and includes examples of harassing behavior. The company's policy provides for a complaint procedure and states that those employees engaging in harassment "will be subject to disciplinary action up to and including termination." In light of this policy, Westvaco decided to terminate Ravenscroft.

Ravenscroft, through his union, challenged his discharge under the collective bargaining agreement (CBA) between Westvaco and the United Paperworkers International Union. The CBA provided that "Employees may be disciplined for just cause by warning, suspension or discharge." The agreement also granted the union the right to grieve any discharge and set forth grievance procedures culminating in arbitration. The CBA additionally provided that

Grievances growing out of discharge ... shall be subject to the Grievance Procedure, but no arbitrator shall have the power to substitute his or her judgement for that of Management, unless he or she finds that the Management has acted arbitrarily or for an ulterior motive or through a mistake in fact or in violation of this Agreement.

Ravenscroft's grievance was presented to an arbitrator in June 1997. The union contended that Westvaco discharged Ravenscroft without just cause. It noted that Ravenscroft was a long-term employee with almost twenty years of service. During his career, Ravenscroft had a good work record with no prior incidents of sexual harassment. Additionally, the company never warned or reprimanded Ravenscroft before discharging him. In response, the company asserted that Ravenscroft had received the company's policy and attended sexual harassment training. It maintained that his violations were severe enough to justify discharge.

The arbitrator rendered his decision on October 27, 1997. He found that Ravenscroft had in fact harassed Shreve and that she had put him on notice that she did not welcome his actions. The arbitrator also found that Ravenscroft's actions were in violation of the company's sexual harassment policy and that his failure to respect Shreve's objections warranted serious discipline. Still, the arbitrator found fault with the company's actions. He found that Westvaco officials were aware of Ravenscroft's conduct, yet they never instructed him to desist. Similarly, Westvaco did not permit Ravenscroft to enter its Employee Assistance Program. That program provides assistance to employees who have problems that may jeopardize their employment. The arbitrator concluded that the company did not have just cause to discharge Ravenscroft and that the appropriate response would have been the application of progressive discipline together with counseling and supervision. The arbitrator then ordered Ravenscroft rein-

stated without back pay, in effect imposing a nine-month suspension without pay.

Westvaco filed suit in the United States District Court for the Western District of Virginia challenging the arbitral decision under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. It argued that the arbitrator exceeded the scope of his authority by substituting his judgment for that of management and that reinstatement contravened public policy because it would prevent the company from carrying out its legal duty to eliminate sexual harassment in the workplace. The district court agreed that Ravenscroft's reinstatement was violative of public policy and granted summary judgment for Westvaco. The union appeals.

## II.

The national commitment to arbitration of labor disputes serves well-established purposes. First and foremost, arbitration is a way of resolving labor-management differences without industrial strife. "Indeed, the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes, lockouts, or other self-help measures." *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 249, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Supreme Court has noted that arbitration of grievances has been a "major factor in achieving industrial peace." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Additionally, labor-management relations law "reflect[s] a decided preference for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Collective bargaining agreements are the primary mechanisms by which industrial conflicts are prevented and resolved by private action. *See Warrior & Gulf,* 363 U.S. at 580, 80 S.Ct. 1347 ("A collective bargaining agreement is an effort to erect a system of industrial self-government."). And effective arbitration serves as "the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties." *Id.* at 581, 80 S.Ct. 1347. This preference for a private ordering of affairs—one promoted by arbitration—reflects both our tradition of resolving private sector disputes without public sector interference and a desire to quickly and efficiently resolve labor grievances before they threaten economic progress on a broad front.

We have recognized that arbitration must be final to be effective. *Richmond, Fredericksburg & Potomac R.R. v. Transportation Communications Int'l Union,* 973 F.2d 276, 278 (4th Cir.1992). Permitting judicial second-guessing of arbitral awards "would transform a binding process into a purely advisory one, and ultimately impair the value of arbitration for labor and management alike." *Id.* at 282; *see also Remmey v. PaineWebber, Inc.,* 32 F.3d 143, 146 (4th Cir.1994). Thus, judicial review of an arbitration award has been characterized as "among the narrowest known to the law." *Union Pac. R.R. v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) (internal quotation marks omitted). Absent the most unusual of circumstances, courts must uphold and enforce arbitral awards.

## III.

■ As the party seeking to overturn the arbitral decision, Westvaco must climb a steep hill. Westvaco first argues that the arbitrator abused his authority by ignoring the contractually guaranteed prerogatives of management.[1] The CBA pro-

1. The union also has raised questions of jurisdiction and venue. We have reviewed these

claims and hold, for the reasons set forth by

vides that "no arbitrator shall have the power to substitute his or her judgement for that of Management, unless he or she finds that the Management has acted arbitrarily or for an ulterior motive or through a mistake in fact or in violation of this Agreement." Westvaco asserts that by modifying the punishment of Ravenscroft, the arbitrator ignored these limitations on his power and improperly imposed his own sense of right and wrong on management.

Generally, the interpretation of a collective bargaining agreement is a matter left to the arbitrator. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). This same maxim applies even when the arbitrator's interpretation resolves a question relating to the scope of the arbitrator's own authority. *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 765, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); *Norfolk & Western Ry. v. Transportation Communications Int'l Union,* 17 F.3d 696, 699 (4th Cir.1994). Because judicial interference with an arbitrator's interpretation threatens both the efficacy and finality of arbitration, judicial review of that interpretation is highly constrained. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco,* 484 U.S. at 38., 108 S.Ct. 364 In reviewing an arbitrator's interpretation, a court examines only whether that interpretation "draw[s] its essence from the contract and [does not] simply reflect the arbitrator's own notions of industrial justice." *Id.; see also Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358.

Thus, the issue here is whether the arbitrator's decision to modify the punishment of an employee drew its essence from the CBA. "Normally, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct." *Misco,* 484 U.S. at 41, 108 S.Ct. 364. We are persuaded that the arbitrator did not commit remediable error by deciding that the CBA permitted him to reinstate Ravenscroft. The CBA negotiated and signed by the union and Westvaco permitted discipline of an employee only for "just cause." The agreement also allowed the union to "dispute[ ] the justification for the discharge of any employee." By contract, "[a]ny grievance resulting from such discharge will be adjusted between the parties [in proceedings culminating in arbitration]."

The CBA, however, does prohibit the arbitrator from "substitut[ing] his or her judgement for that of Management, unless he or she finds that the Management has acted arbitrarily ... or in violation of this Agreement." By reinstating Ravenscroft, the arbitrator plainly substituted his own judgment for that of management. The question is whether he could plausibly conclude that the CBA permitted him to do so. We hold that he could.

The arbitrator made explicit findings which spoke to the contractual requirement that discharge be only for "just cause." Initially, the arbitrator found that it is "clear and undisputed" that Ravenscroft had "no prior disciplinary history with regard to sexual harassment." Yet "the Company never said so much as a word to grievant about [his] conduct until January 10, 1997, when it fired him after almost 20 years of service." The arbitrator then noted that the company never gave the grievant counseling or supervision with respect to his behavior "despite the undisputed fact that Company officials were aware of [his] conduct." While the company had an Employee Assistance Pro-

the district court, that jurisdiction is present and venue is proper.

gram, the arbitrator noted that it never provided Ravenscroft any opportunity to take advantage of it. Further, the arbitrator found that although the company's own sexual harassment policy endorsed "the use of progressive discipline," the company in this case had ignored intermediate disciplinary steps and proceeded immediately to discharge. The arbitrator observed, "While there may be cases where an employee's immediate discharge would be appropriate, this record does not support the conclusion that grievant's conduct was so egregious as to support that response." In sum, the arbitrator imposed on Ravenscroft the severe sanction of a nine-month suspension without pay, but modified the sanction of absolute discharge.

 In finding that the company wrongly terminated Ravenscroft, the arbitrator ruled that management action in this case violated the CBA's explicit requirement of "just cause." This ruling that "the Company did not have 'just cause' to discharge [Ravenscroft] when it did" leads to the conclusion that the company acted arbitrarily and in contravention of the CBA. These are precisely the circumstances where the collective bargaining contract provides that the arbitrator may substitute his judgment for that of management. Given the agreement's text and the facts as found in arbitration, the arbitrator could have rationally concluded that he was authorized by the parties to adjust a disciplinary sanction. In fact, the company itself framed the issue for arbitration as "whether the Company had just cause to terminate the grievant for sexual harassment." And the arbitrator interpreted the agreement to mean that every disciplinary step—including "warning, suspension or discharge"—must be supported by just cause. "[W]e need not (indeed cannot) address whether the [arbitrator's] interpretation of [his] powers was the correct one. Even if incorrect, it was at least arguably rational and 'drew its essence' from the arbitration agreement...." *Norfolk & Western Ry.*, 17 F.3d at 696.

We reiterate that the standard of review here is among the most deferential known in law, and we therefore sustain the arbitrator's interpretation of his authority.

## IV.

 Westvaco also contends the district court rightly found that reinstatement of Ravenscroft violated an established public policy against sexual harassment. It asserts that such a policy is well-defined by Title VII and judicial and administrative interpretations of that law. Those interpretations require an employer to prevent sexual harassment and to remedy hostile-environment harassment when it does occur. Westvaco argues that the reinstatement of Ravenscroft, after he continually harassed Shreve, prevents the employer from ensuring that its workplace is not a hostile environment for its female employees. As such, the arbitrator's ruling is void for public policy.

We disagree. All of the protections of a labor arbitration process would go for naught if they could be undone by a broad and amorphous public policy exception. For this reason, the Supreme Court has noted there is no "broad judicial power to set aside arbitration awards as against public policy." *Misco*, 484 U.S. at 43, 108 S.Ct. 364. Instead the power is a narrow one:

> If the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it. Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

*W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177 (citation and internal quotation marks omitted). Both the Supreme Court and this circuit have been most reluctant to upset on public policy grounds the contractual commitments of parties to arbitrate their grievances. *See, e.g., id.* at 766–72,

103 S.Ct. 2177; *Misco,* 484 U.S. at 42–45, 108 S.Ct. 364; *Remmey,* 32 F.3d at 150.

■ In accepting appellee's argument, the district court overlooked three critical factors. First, while it is certainly true that there is a public policy against sexual harassment, the district court formulated it in too general a fashion. There is no public policy that every harasser must be fired. Instead, a company must "exercise[ ] reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *see also* EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11(d) (1998) (requiring employers to take "immediate and appropriate corrective action"). Nowhere in this litany of prevention and correction is there the suggestion that every employee who makes a mistake must automatically lose his or her job. And because misconduct often differs in degree, there is no universal punishment that fits every case. We therefore agree with those circuits that have concluded the general public policy against sexual harassment is not sufficient to supplant labor arbitration of employee disciplinary sanctions. *See Chrysler Motors Corp. v. International Union,* 959 F.2d 685 (7th Cir.1992); *Communication Workers of Am. v. Southeastern Elec. Coop.,* 882 F.2d 467 (10th Cir.1989); *but see Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters,* 969 F.2d 1436 (3d Cir.1992); *Newsday, Inc. v. Long Island Typographical Union,* 915 F.2d 840 (2d Cir. 1990). In this case, Westvaco agreed to

let an arbitrator review its decisions to discharge. The arbitrator found that a nine-month suspension without pay—and not discharge—was the appropriate sanction. We cannot say that the imposition of such strict punishment prohibits an employer from exercising reasonable care to promptly correct harassing behavior.

Second, the use of public policy to void written contracts is dangerous because public policy itself is often a two-edged sword. The district court's ruling on behalf of one public policy failed to take account of countervailing public policies favoring the enforcement of the arbitral decision. As an initial matter, voiding the award in this case would erode the strong public policy favoring the private, peaceful resolution of industrial disputes. The company and the union agreed in the CBA to allow an arbitrator to review disciplinary actions for just cause. The nullification of that bargain would "undermine the federal labor policy that parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored." *W.R. Grace,* 461 U.S. at 771, 103 S.Ct. 2177.[2] Additionally, voiding the arbitral award in this case would strike at the values of progressive discipline and industrial due process. The CBA at issue here reflects the mutual intentions of the parties to resolve disputes in a manner that preserves due process for employees as to both culpability and punishment. "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies." *Enterprise Wheel,* 363 U.S. at 597, 80 S.Ct. 1358. Invoking the public policy against sexual harassment as the district

---

**2.** We do not have before us conduct that compromises the performance of a safety-sensitive job. *See, e.g., Union Pac. R.R. v. United Transp. Union,* 3 F.3d 255 (8th Cir.1993); *Delta Air Lines v. Air Line Pilots Ass'n Int'l,* 861 F.2d 665 (11th Cir.1988). We also do not address criminal statutes prohibiting drug use, possession, and distribution in the workplace. *See, e.g., Exxon Corp. v. Esso Workers' Union,* 118 F.3d 841(1st Cir.1997); *Exxon Shipping Co. v. Exxon Seamen's Union,* 993 F.2d 357 (3d Cir.1993). Such criminal misconduct may raise concerns not present here, and despite the urging of appellee, a ruling with respect to such issues must await a case presenting them.

court did disturbs this bargain. It also signals that public policy requires employers to have a hair trigger and immediately discharge long term employees who stand accused of inappropriate conduct. In sum, the whole public policy path is a slippery one. One public policy too often runs headlong into another, and that is a reason for the contractual agreement to prevail.

Lastly, we emphasize as a simple matter of judicial restraint our reluctance to invoke broad nostrums of public policy to void private bargains. Anything but a narrow implementation of that doctrine provides courts too much latitude. Public policy can easily become a vessel into which judges pour their own subjective preferences in derogation of the arbitral process and the contractual commitments of the parties which it represents. Such overreaching erodes not only the foundation of collective bargaining and arbitration, but the integrity of the judiciary itself.

### V.

This case invites us to supplant the judgment of the process chosen by the parties to resolve their disputes with our own views. It is an invitation we cannot accept. The parties bargained for the judgment of an arbitrator, not a court. For the foregoing reasons, the judgment of the district court must be reversed and remanded with directions to enforce the arbitral award.[3]

*REVERSED AND REMANDED*

---

3. This means of course that the grievant is entitled to be reinstated and made whole from the date of the arbitral award. Because Westvaco did not challenge the arbitration award "without justification," however, we deny the

union's motion for attorneys' fees. *See United Food & Commercial Workers, Local 400 v. Marval Poultry Co.,* 876 F.2d 346, 350(4th Cir.1989).