**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 29 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KENNECOTT UTAH COPPER
CORPORATION,

     Plaintiff-Counter-Defendant -
     Appellant,

vs.

GEORGE BECKER; WAYNE
HOLLAND, JR.; TOM PERFILI;
SUBDISTRICT 5 UNITED STEEL
WORKERS OF AMERICA; LOCAL
392 UNITED STEELWORKERS OF
AMERICA,

     Defendants - Appellees,

and

UNITED STEEL WORKERS OF
AMERICA, AFL-CIO,

     Defendant-Counter-Claimant -
     Appellee.

No. 98-4081

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 97-CV-640-K)**

---

Raymond M. Deeny (William L. Sasz, with him on the brief), Sherman &
Howard, L.L.C., Colorado Springs, Colorado, for Plaintiff-Counter-Defendant -

Appellant.

David I. Goldman (Rudolph L. Milasich, Jr., Assistant General Counsel and Andrew J. Krafts, Assistant General Counsel, on the brief), United Steelworkers of America, Pittsburgh, Pennsylvania, for Defendants - Appellees.

---

Before **TACHA**, and **KELLY**, Circuit Judges and **WEST**,[*] District Judge.

---

**KELLY**, Circuit Judge.

---

This action involves an employer challenge to the validity of an arbitration award requiring the employer to reinstate an employee who, after an accident, tested positive for marijuana. The union counterclaimed seeking enforcement of the award. The district court granted summary judgment in favor of the union and the employer appeals. Federal jurisdiction exists under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a) and 28 U.S.C. § 1291. We affirm.

## Background

Kennecott Utah Copper Corporation ("Kennecott") entered into a collective bargaining agreement ("CBA") with the United Steelworkers of America, AFL-CIO and their affiliated districts (collectively "Union"). The CBA came into effect on October 6, 1993 and was to remain in force until September 30, 1996.

---

[*]The Honorable Lee R. West, Senior District Judge, United States District Court of the Western District of Oklahoma, sitting by designation.

In relevant part, the CBA stated: "No employee shall be disciplined or discharged without just cause." CBA Article 5.1 Discipline , 1 Aplt. App. at 32. "Just cause" is nowhere defined in the CBA.

In 1994, Kennecott and the Union joined in a Memorandum of Agreement which detailed the company's new "Drug and Alcohol Abuse Policy" ("Policy"). The Policy proscribed the use of drugs in the workplace and permitted Kennecott to test employees for drug use under certain conditions. Included among these was a provision permitting testing "[w]hen an employee may have contributed to an accident involving a fatality, bodily injury, or damage to property." Drug and Alcohol Abuse Policy, Testing , B(2), Aplt. App. at 81. The Policy also contained a section entitled Implementation and Compliance which stated:

> Compliance with this Policy is a condition of employment.
> The Company intends to take disciplinary action, up to and
> including termination, against any employee who violates
> this Policy.

Policy, Implementation and Compliance B, Aplt. App. at 83.

On July 26, 1996, a truck driver ("grievant"), who was a member of the Union, was involved in a roll-over accident with a fully loaded ten-wheel dump truck at the Kennecott Bingham Canyon Mine. After conducting an investigation, Kennecott determined that the accident was primarily caused by the failure of a tie-rod on the truck which made the steering inoperable. However, the investigators also found that the grievant may have contributed to the accident by

failing to brake in a timely manner.

Kennecott ordered the grievant to submit to a drug test which was positive for cannabinoids. The grievant requested an evaluation from an independent lab with the same result. At a July 31, 1996 hearing, the grievant maintained that he had not used marijuana for five or six weeks. Subsequently, he was terminated. The Union filed a grievance and the matter was submitted to arbitration as required under the CBA.

At the arbitration, the grievant admitted that he had used marijuana two days before the accident and that his former statement regarding drug use was a lie. The arbitrator found that Kennecott was justified under the CBA in requiring the grievant to submit to the drug test. He also found that Kennecott had a legitimate interest in preventing drug use and the influence of drugs on the job. This interest, however, when read in light of the "just cause" clause, required more than a showing of the mere presence of drugs. "[I]n order to discipline, especially terminate, an employee for a positive result on this particular test, there must be some additional evidence of on the job impairment, possession or use." Aplt. App. at 5. There was no evidence that the presence of cannabinoids in the grievant's system had any effect upon or relationship to the roll-over accident. Therefore, the arbitrator found that "[t]he sole reason [for dismissal] was the positive drug test, and this, standing entirely alone, is not enough to create just

cause to terminate." Id. The arbitrator ordered reinstatement but denied back pay because of the grievant's dishonesty.

Kennecott sought to overturn the award in district court, claiming that the arbitrator exceeded his authority in interpreting the CBA and that reinstatement of the Grievant would violate public policy. The Union cross-claimed for enforcement. On cross motions for summary judgment, the district court held in favor of the Union and Kennecott appeals.

Discussion

The applicable standard of review was recently discussed in Kennecott Utah Copper Corp. v. Becker, No. 98-4045, 1999 WL 58670 (10th Cir. Aug. 5, 1999).

> This court reviews a summary judgment in a labor-arbitration case de novo. Judicial review of labor-arbitration awards, however, "is among the narrowest known to the law." Champion Boxed Beef v. Local No. 7, 24 F.3d 86, 87 (10th Cir.1994). "The arbitrator's factual findings are beyond review, and, so long as the arbitrator does not ignore the plain language of the [CBA], so is his interpretation of the contract." Id. "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

Id. at *5. So long as the award "draws its essence from the collective bargaining

agreement," the court must uphold the arbitrator's decision. United Steelworkers

v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960).


A.  Arbitration Award

Kennecott argues that the arbitrator failed to follow the plain language of

the CBA and the Policy.  An arbitration award will not be upheld if it is contrary

to the express language of the contract.  Misco, 484 U.S. at 38; see also Mistletoe

Express Service v. Motor Expressmen's Union, 566 F.2d 692, 694 (10th Cir.

1977).  Kennecott argues that the arbitrator inserted a new requirement of job

impairment into the contract, and points to the following language in the

arbitration opinion:

> I do not believe that a positive drug test is a proper ground
> for discipline if it does not indicate on the job use or
> possession of drugs or working under the influence of
> drugs or alcohol. . . .
>         . . . .
> [I]n order to discipline, especially terminate, an employee
> for a positive result on this particular test, there must be
> some additional evidence of on the job impairment,
> possession or use.

Aplt. Br. at 9 (quoting Alt. App. at 4, 6).  In particular, Kennecott argues that the

use of words like "believe" prove that the arbitrator was dispensing his own brand

of justice rather than strictly interpreting the contract.

Kennecott's argument is unavailing given the applicable standard of

review. In determining whether or not the arbitration award "draws its essence" from the CBA, a reviewing court looks to the award itself and not at every phrase contained in the arbitrator's opinion.

> A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

Enterprise Wheel, 363 U.S. at 598 (footnote omitted); see also Tennessee Valley Authority v. Tennessee Valley Trades & Labor Council, 184 F.3d 510, 514 (6th Cir. 1999) (upholding arbitration reinstatement award in which arbitrator used "I believe" language); Arch of Illinois v. District 12, United Mine Workers, 85 F.3d 1289, 1293 (7th Cir. 1996) ("[Before we reject an award because of language in the arbitrator's opinion, the opinion must unambiguously reflect that the arbitrator based his decision on noncontractual grounds."). We analyze the language of the opinion as it relates to the final award.

The specific award in this case was reinstatement. The arbitrator held: "As Grievant was terminated without just cause, he should be returned to work without loss of seniority." Aplt. App. at 5. Nowhere in the CBA or Policy was just cause defined and nowhere did the parties specify that mere presence of drugs

constituted just cause for termination.  Cf. Mistletoe, 566 F.2d at 694 (addressing a collective bargaining agreement which specifically listed actions which constituted just cause for discharge).  Kennecott, however, argues that the language of the Policy ("intends to take disciplinary action, up to and including termination" and "[c]ompliance with this Policy is a condition of employment")      is simply another way of stating that any drug use or presence is equivalent to just cause.  This is simply a matter of interpretation.  It is the province of the arbitrator to interpret contractual provisions and a reviewing court may not substitute its interpretation for that of the arbitrator.  Litvak Packing Co. v. United Food & Commercial Workers, 886 F.2d 275, 276 (10th Cir. 1989); see also First National Supermarkets v. Retail Employees Local 338, 118 F.3d 892, 896 (2d Cir. 1997) (noting that it is arbitrator's responsibility to interpret just cause when CBA does not otherwise define the term).

The arbitrator's decision makes it clear that he was interpreting the Policy in light of the employer's right to discharge only for just cause, and we cannot review the merits.  See Monroe Auto Equipment Co. v. International Union, 981 F.2d 261, 268 (6th Cir. 1992).  The interpretation of just cause to require a prerequisite, such as on-the-job impairment, before termination is allowed draws its essence from the CBA and must be upheld.  See Exxon Corp. v. Esso Worker's Union, Inc., 118 F.3d 841, 845-46 (1st Cir. 1997) (upholding similar

interpretation of just cause language, although reversing arbitration award on public policy grounds).

B. Public Policy

Kennecott also argues that the arbitration award should not be enforced because it violates public policy. "[I]n determining whether an arbitration award violates public policy, a court must assess whether 'the specific terms contained in [the contract] violate public policy,' by creating an 'explicit conflict with other 'laws and legal precedents.''" Seymour v. Blue Cross/Blue Shield, 988 F.2d 1020, 1024 (10th Cir. 1993) (citations omitted). The policy involved must be an "explicit public policy" that is "well defined and dominant, and is . . . ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" W.R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 766 (1983) (citation omitted)). In applying this limited exception, we ask only whether the award itself (i.e. reinstatement), and not the underlying reasons for the award, violate public policy. See International Brotherhood of Electrical Workers v. Niagara Mohawk Power Corp., 143 F.3d 704, 716 (2d Cir. 1998); Stead Motors v. Automotive Machinists Lodge, 886 F.2d 1200, 1212 (9th Cir. 1989) ("If a court relies on public policy to vacate an arbitral award reinstating an employee, it must be a policy that bars reinstatement.").

Several courts have held that a clear public policy exists against performing safety sensitive jobs while impaired by drugs or alcohol. See, e.g., Exxon Corp. v. Esso Workers' Union, 118 F.3d 841, 846-48 (1st Cir. 1997) (gasoline tanker driver); Exxon Corp. v. Baton Rouge Oil & Chemical Workers Union, 77 F.3d 850 (5th Cir. 1996) (chemical plant operations controller); Exxon Shipping Co. v. Exxon Seaman's Union, 11 F.3d 1189, 1191-96 (3d Cir. 1993) (oil tanker seaman): Union Pacific R.R. Co. v. United Transp. Union, 3 F.3d 255, 258-63 (8th Cir. 1993) (railroad brakeman); Exxon Shipping Co. v. Exxon Seaman's Union, 993 F.2d 357, 360-64 (3d Cir. 1993) (oil tanker helmsman); Gulf Coast Indus. Workers Union v. Exxon Co., 991 F.2d 244, 248-53 (5th Cir. 1993) (chemical refinery technician); Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l, 861 F.2d 665, 671-74 (11th Cir. 1988) (airline pilot); Iowa Elec. Light & Power Co. v. Local Union 204, Int'l Bhd. of Elec. Workers, 834 F.2d 1424 (11th Cir. 1987) (nuclear power plant machinist). These cases are distinguishable. In the present case, there was no finding that grievant ever used drugs at work or was impaired while operating in a safety sensitive position. The difficult issue in this case is whether reinstatement of the grievant would actually violate public policy, given a single positive test, no evidence of impairment, and no evidence of workplace possession or use.

Kennecott argues that the arbitrator's award violates the public policy

- 10 -

embodied in the Utah Drug and Alcohol Testing statutes, Utah Code. Ann. § 34-38-1 to 34-38-14 (Michie 1997).  The legislative findings indicate "that a healthy and productive work force, safe working conditions free from the effects of drugs and alcohol . . . are important to employers, employees and the general public." Id. § 34-38-1.  The enactment provides that drug testing of employees for the presence of drug or alcohol is not unlawful; however, employers and management must also submit to the testing on a periodic basis.  See id. § 34-38-3.  To test reliably for the presence of drugs or alcohol, an employer may require samples from employees.  See id. § 34-38-4.  The testing "shall be carried out within the terms of a written policy which has been distributed to employees" and the written policy may require testing for the purposes other than possible individual impairment including accident investigation and the safety of the employees or general public.  Id. § 34-38-7(1) & (2).  Positive test results may be used for a broad range of disciplinary or rehabilitative actions, including termination.**  See

***

** The statute provides in pertinent part:

Upon receipt of a verified or conformed positive drug or alcohol test result which indicates a violation of the employer's written policy, . . . an employer may use that test result . . . as the basis for disciplinary or rehabilitative actions, which may include the following:
(1) a requirement that the employee enroll in an employer-approved rehabilitation, treatment or counseling program, which may include additional drug or alcohol testing, as a condition of continued employment;
(2) suspension of the employee with or without pay for a period of

- 11 -

id. §§ 34-38-8; 34-38-13(3).  Unless the employer relies upon a false test result, an employee will not have a cause of action against the employer for establishing a drug testing program under the statute and taking the specified disciplinary or rehabilitative actions.  See id. §§ 34-38-1; 34-38-10.  The thrust of these provisions is to balance the interests of employers, employees and the general public by encouraging "fair and equitable" testing for drugs and alcohol.  Id. § 34-38-1.

We are not persuaded that these provisions constitute a clear public policy that prohibits reinstatement of an employee in the grievant's circumstances for several reasons.  First, while a general policy exists against performing safety sensitive jobs while impaired by drugs or alcohol, a general policy is not enough–there must be a showing of a specific public policy that would be violated by this award.  See Misco, 484 U.S. at 44.  The Utah provisions relied upon by Kennecott simply do not suggest that every employee in a safety sensitive position that tests positive one time, with no other evidence of drug involvement, must be fired.  Accord Niagara Mohawk, 143 F.3d at 718 (finding that even detailed

time;
(3) termination of employment
. . .
(5) other disciplinary measures in conformance with the employer's usual procedures, including any collective bargaining agreement.

Utah Code Ann. § 34-38-8.

statutes regulating nuclear facilities "do not proscribe the reinstatement of employees . . . who have tested positive for drugs or alcohol."); United Food & Commercial Workers Union v. Foster Poultry Farms, 74 F.3d 169, 174 (9th Cir. 1995) (noting that regulation prohibiting drug use by commercial drivers is not equivalent to a policy never to employ drivers who once test positive for drug use); Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen & Helpers Local Union, 909 F.2d 885, 893 (6th Cir. 1990) ("While it is indisputable that allowing intoxicated persons to drive motor vehicles violates public policy, it does not follow, however, that any arbitration award reinstating an employee discharged for being intoxicated while off-duty, or arrested for off-duty possession of controlled substances may never be enforced without violating the public policy exception of arbitration awards.").

While Utah Code Ann. § 34-38-8 does permit an employer to terminate an employee for failing a drug test, it is permissive and not mandatory, and termination is only one of several discretionary and non-exclusive remedies. The presence of alternative remedies strongly suggests rejection of a "one size fits all" approach to the problem; rather, facts and circumstances of the employee's situation and the positive test matter. Moreover, Utah Code Ann. § 34-38-8(5) envisions other disciplinary measures in conformity with a collective bargaining agreement. See Delta Air Lines, 861 F.2d at 670 (noting that even though a

public policy might condemn behavior such as trafficking in drugs, an employer can still agree to arbitrate whether an employee can continue to work despite drug trafficking off the job).

Second, some deference to the arbitral process must inform our judgment whenever it is suggested that public policy prohibits enforcement of the award that is the product of the parties' agreement. Kennecott and the Union agreed to arbitrate disciplinary actions for just cause in the CBA. We must be cautious of displacing the written agreement based upon general public policy concerns because "parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored." W.R. Grace & Co., 461 U.S. at 771. "When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear and reach a fair solution of a problem. This is especially true when it comes to formulating remedies." Enterprise Wheel, 363 U.S. at 597. A court may not substitute its judgment for that of the arbitrator. Nor may a court decide facts to support its public policy views.

Finally, determining public policy is a uniquely legislative endeavor, one not well suited to judicial resolution, particularly given a complex social problem. We must be cautious of substituting our preferences in lieu of the contractual commitments of the parties under the guise of enforcement of public policy.

Kennecott urges us to follow the holding of the First Circuit in Exxon Corp. v. Esso Workers' Union, Inc., 118 F.3d 841 (1st Cir. 1997). In that case, the union driver of a gasoline tanker tested positive for cocaine, although no showing was made that he was under the influence at any time during driving. The arbitrator, dealing with a CBA very similar to the one in the present case, held that termination was not permissible as a matter of just cause without a further showing of work related impairment. See id. at 845.

The First Circuit upheld the arbitrator's interpretation of the CBA but reversed the award as violative of public policy. The court determined that public policy "dictates not only that employees refrain from performing safety-sensitive jobs while under the influence of drugs, but also that employers develop (and enforce) programs designed to discourage such activity." Id. at 849. Based upon that expanded policy, the court held "that forcing an employer to reinstate an employee who tests positive for drug use pursuant to a test that the employer administers as part of a drug-free workplace would undermine that policy." Id. at 850.

It is easy to be sympathetic to the expanded policy, and few would quarrel with the fact that an employer is not required "to await the occurrence of an accident before discharging an employee who tests positive for drug use." Id. at 849. However, we question whether a federal court's finding of a violation of

- 15 -

this policy in every positive drug test case, without regard to the specific facts (such as drug use in the workplace and non-workplace, amenability to discipline, and effect on the employer's deterrent program) can be squared with the Supreme Court's admonition that case-specific facts matter and it is the province of the arbitrator, and not the courts, to find such facts. See Misco, 484 U.S. at 44-45 (court exceeded its authority by engaging "in factfinding about [employee's] use of drugs and his amenability to discipline"). "A refusal to enforce an award must rest on more than mere speculation or assumption." Id. at 44.

In any event, Kennecott does not rely upon the same provisions at issue in Exxon Corp. v. Esso Workers' Union, Inc., 118 F.3d at 847-48, and its reliance upon the various sections of Utah law discussed above is not persuasive to demonstrate the alleged public policy violation.

AFFIRMED.