**PEOPLESOFT, INC., Plaintiff,**

v.

**AMHERST, L.L.C., Defendant.**

No. CIV.A. 05–F–105(PAC).

United States District Court,
D. Colorado.

April 25, 2005.

Randall M. Livingston, Bailey & Peterson, P.C., Denver, CO, Joseph Goldberg, Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., Albuquerque, NM, for defendants.

## ORDER ON PETITION AND PENDING MOTIONS

FIGA, District Judge.

An arbitration award was entered on or about December 22, 2004 in favor of the respondent in this case, Amherst. LLC ("Amherst"), and against J.D. Edwards World Solutions Company ("JDE"), which is the predecessor in interest of the peti-

tioner herein. PeopleSoft, Inc. ("People-Soft"). Petitioner initiated this action by filing "PeopleSoft's Petition to Stay the Execution and Vacate Arbitration Award" (Dkt.# 1). Amherst has filed motions to dismiss PeopleSoft's petition (Dkt.# 7) and to confirm the arbitration award (Dkt.# 4). The petition and these motions have been fully briefed and are ripe for determination consistent with F.R.Civ.P. 81(a)(3).

■ The parties agree that the motions are to be determined pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* The FAA, however, does not create an independent basis for federal jurisdiction. *See e.g. P & P Industries, Inc. v. Sutter Corp.,* 179 F.3d 861, 866 (10th Cir. 1999). While they do not actually come out and say it, neither party challenges the jurisdiction of this Court to decide the dispute. The apparent basis for federal subject matter jurisdiction of the petition is diversity of citizenship pursuant to 28 U.S.C. § 1332(a), as PeopleSoft is a Delaware corporation with its principal place of business in California, while Amherst is a Nevada limited liability company with its principal place of business in New Hampshire. *See* Petition at ¶¶ 1–2. Also, the amount in controversy far exceeds $75,000 exclusive of interests and costs as Exhibit B to the Petition reflects a multimillion dollar arbitration award. Venue is based on the arbitration award having been made in this district.

## BACKGROUND

Amherst is a national reseller of computer hardware and related software. Amherst purchased computer software known as OneWorld from PeopleSoft's predecessor. The software is described as "complex ERP software, providing an array of applications that help a business integrate and manage its human resources, financials, supply chain, manufacturing, and customer service functions." (Petition at

¶ 7.) The software proved to be a "flawed product." "The implementation period did not go smoothly," and OneWorld's "go-live" performance at Amherst, *i.e.* rolling out the use of the software, proved to be a "disaster." Even though "many critical problems were resolved after three months of frenetic effort by both parties, there remained many open issues of missing or defective functionality that impacted Amherst users for months and even years." (Award at 4–5.) JDE knew "that OneWorld was immature and buggy and lacked functionality explicitly represented to be available for Amherst," yet it sold the product "to Amherst without any warning of the know defects or lacking functionality." (*Id.* at 7.)

Pursuant to the arbitration provisions of the parties' Software License, Services and Maintenance Agreement dated July 30, 1998, Art. V., ¶ 9, an arbitration ensued between August and October 2004 before a three-arbitrator panel involving 41 witnesses and over 255 exhibits. It was conducted under the auspices of the American Arbitration Association as Commercial Arbitration Tribunal 77 Y 133 00045 03JRJ. By a two-to-one vote, the arbitrators determined that Amherst was entitled to a sizeable monetary award. The dissenting arbitrator, Randall W. Bodner, "decline[d] to join in the majority's Award" (Award, Dissenting Opinion, at 8) on the merits of applying what he considered to be pertinent law to the facts of this controversy, not because of any jurisdictional issue or belief that the arbitration panel had exceeded its authority.

In August 2003, several months prior to the issuance of the arbitration award, PeopleSoft acquired JDE. PeopleSoft's main issues that prompt its effort to overturn the arbitration award include the scope of certain interim settlements of issues between the parties-whether they constituted

resolution of billing disputes or more than that. These settlements arguably affect the damage award of the arbitrators- whether Amherst should receive a substantial amount for Amherst incurring "large and unexpected expenses to JDE and non-JDE consultants for services devoted to getting OneWorld to function in Amherst's business environment" less a reduction for the amount that Amherst initially would have paid to obtain a comparable system had it not chosen JDE as its vendor (referred to in the Award at 12, ¶ 37, as the "alternate route"). PeopleSoft contends the award should be vacated because of the settlements.

## APPLICABLE LAW

■ A district court's review of an arbitration award under the FAA is "strictly limited." It is a "highly deferential" standard of review, which has been described as "among the narrowest known to the law." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932 (10th Cir.2001) (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995)). This is because "[b]y agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1182 (10th Cir.2000) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). A court may not, therefore, independently judge an arbitration award. *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir.1982).

■■ A court may vacate an arbitration award only in the limited circumstances provided in § 10 of the FAA, 9 U.S.C. § 10, or in accordance with a few judicially created exceptions, *Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co.*, 119 F.3d 847, 849 (10th Cir.1997). Section 10(a) of the FAA

contemplates vacating an arbitration award where it was procured by corruption, fraud, or undue means; where there was evident partiality or corruption by one or more arbitrators; where the arbitrators improperly refused to postpone the hearing or refused to receive relevant evidence or other such procedural irregularity; or, where the arbitrators exceeded their powers.

■ The nonstatutory bases for vacating an award are similarly circumscribed. In the Tenth Circuit a court can vacate an arbitration award where there was a manifest disregard of law, a violation of public policy or the denial of a fundamentally fair hearing. *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001). Manifest disregard of the law means any "willful inattentiveness to the governing law," and something "more than error or misunderstanding with respect to the law." *ARW Exploration Corp., supra*, 45 F.3d at 1463. "An arbitrator's erroneous interpretations or applications of law are not reversible." *Id.*

■ The authority to vacate an arbitration award on public policy grounds does not include "a broad judicial power to set aside arbitration awards as against public policy" *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In *Misco*, the Supreme Court set forth two requirements for overturning arbitration awards on the grounds of public policy. First, the "alleged public policy must be properly framed under the approach set out in *W.R. Grace [& Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)]." *Id.* This demands "examination of whether the award created any explicit conflict with other 'laws and legal precedents' rather than an assessment of 'general considerations of supposed public interests;'" *Id.* (quoting *W.R. Grace, supra*,

461 U.S. at 766, 103 S.Ct. 2177). The claimed policy must be "explicit public policy" that is "well defined and dominant." *W.R. Grace, supra,* 461 U.S. at 757, 103 S.Ct. 2177. The Supreme Court in *Grace* found that obedience of judicial orders and voluntary compliance with Title VII of the Civil Rights Act of 1964 are two such public policies. Second, "the violation of such a policy must be clearly shown if an award is not to be enforced." *Misco, supra,* 484 U.S. at 43, 108 S.Ct. 364.

## DISCUSSION

Here, PeopleSoft seeks to vacate the arbitration award under the judge-made "manifest disregard of the law" and the "violation of public policy" rationales as to the interim settlements. No argument for voiding the award expressly set forth under 9 U.S.C. § 10(a) has been advanced. The jurisdiction of the arbitration panel to have proceeded as it did is not being attacked. No procedural or evidentiary objection has been raised. Also, PeopleSoft does not contend that the arbitration panel erred determining that Colorado law applied to the issues before it.

The factual findings as to the OneWorld software's significant incompatibility with Amherst's needs and systems are not being challenged particularly. PeopleSoft explains that the "issues were caused by a combination of problems with the software, problems with the implementation, and problems with hardware." PeopleSoft's Combined Memorandum dated March 4, 2005 at 3. PeopleSoft however goes on to minimize Amherst's plight, citing to evidence that it claims shows that "by the beginning of 2000 J.D. Edwards resolved the major problems pursuant to its obligations under the Contract as Amherst acknowledged contemporaneously to J.D. Edwards.... In the year following the go-live, Amherst actually outperformed its financial predictions and could not identify a single lost sale attributable to One-World.... In fact, Amherst continues to use the OneWorld software to this day." *Id.* (citations to record omitted). These assertions by PeopleSoft essentially acknowledged problems that were the fault of its predecessor in interest. How these problems were addressed by the parties is what forms the basis of this Court's review.

### A. *The Scope of the Interim Settlements*

 There were three principal adjustments between the parties prior to arbitrating their disputes. The first occurred in the Spring 1999 relating to purported misrepresentations made during the sales cycle, difficulties during the implementation and cost overruns. The second occurred about one year later, on April 27, 2000, when PeopleSoft's predecessor agreed to pay Amherst $106,000. The third settlement is dated July 3, 2001 and concerned disputed consulting invoices that PeopleSoft's predecessor rendered substandard services in late 2002. It involved Amherst agreeing to pay one-half of the disputed accounts receivable with JDE crediting Amherst for the other one-half, or $119,213.99.

The arbitration panel majority found that, notwithstanding the testimony of two witnesses, Hall and Dupler, to the contrary.

the most persuasive evidence-contemporaneous documents discussing the disputes and the settlement documents themselves-compels the conclusion that settlements were limited to billing disputes. There are no contemporaneous documents that indicate that there was either a meeting of the minds or an exchange of sufficient consideration to support the all-inclusive range of releases argued for by JDE. There are no documents indicating a knowing release

of all claims, including claims for misrepresentation or breach of warranties, on the part of Amherst. Given the large number of complaints that JDE was receiving [A–301] and its status as a publicly owned company, the majority binds it difficult to believe that purported settlements of substantial potential claims would be so inadequately documented. Award at 8, ¶ 24 (bracketed exhibit reference in original). The panel majority went on to explain why they thought these settled disputes focused on billing disagreements only. *Id.* at ¶¶ 25–27. The third arbitrator so agreed as to the third dispute only. *Id.* at ¶ 28.

This Court should not and does not review the arbitration in any sort of appellate capacity. It does not matter whether the Court would have reached the same result were it to have heard the matter *de novo*. Also it is irrelevant whether the two majority arbitrators made a mistake in characterizing the settlements as resolution of mere "billing disputes," rather than overarching releases as to liability and damages. If their decision as to the legal effect of two of the interim settlements was wrong, an assumption the Court accepts for purposes of petitioner's argument, PeopleSoft has not shown this mistake was anything more than mere error or a misunderstanding of the law. Nothing in the 12–page, 40 paragraph majority portion of the Award suggests that it was imbued with wilful inattentiveness of applicable legal standards or invented facts. The analysis of the majority arbitrators, Lois W. Abraham and Robert A. Peterson, set forth in the award at 8–9, ¶¶ 24–27, along with the testimony and exhibits cited, which the Court has reviewed, meets the threshold of there being no wilful inattentiveness or manifest disregard of the law by them. *See, generally,* the exhibits cited at 9–14 of Amherst's March 18, 2005 Combined Response Brief. The serial nature of the interim settlements culminating in what all three arbitrators thought to be a less than global billing adjustment also lends plausibility to the conclusion that none of them constituted a comprehensive release.

While the third arbitrator rejected some of the other arbitrators' determinations. such dissent in some respects actually reinforces the validity of the award. Sometimes reasonable decision-makers can disagree as to the application of facts found in the record to the law, Here the arbitrators, who were "long on collegiality and short on unanimity regarding the application of some of the proposed legal theories to the factual situation," (Award at 6) had the benefit of each other's analysis before issuing their "concise reasoned Award" as required by the scheduling order. Having an articulate and persuasive dissent, even if it did not carry the day, enhanced the credibility of the majority opinion by showing that it survived the crucible of contemporaneous criticism. Indeed, the arbitrators were in accord as to the governing law, but differed as to the facts, credibility determinations (*see* Award at 11) and how settlements based on those facts were to be construed.

It is not uncommon for arbitrators to end up disagreeing, particularly when each side picks one and at a third is chosen by the two arbitrators. Such an arbitrator is often viewed as a "partisan." *See e.g.,* Rule 1.12(d) of the Colorado Rules of Professional Conduct: "An arbitrator selected as a *partisan* of a party in a multi-member arbitration panel is not prohibited from subsequently representing that party in other unrelated matters." (Emphasis added.) A lack of unanimity in such circumstances is not necessarily indicative of any egregious impropriety by any arbitrator mandating judicial redress, but rather a clash of analyses that reached partial consensus but not unanimity. Under the par-

ties' Software License, Services and Maintenance Agreement dated July 30, 1998, Art. V, ¶ 9, the parties were subject to the Uniform Arbitration Act and the procedural rules of the American Arbitration Association. Each side was to pick an arbitrator having experience in the area of information technology or computer software licensing, installation or implementation, and the two arbitrators were to have picked a third-a process not necessarily leading to unanimity. Notwithstanding the arbitrators' disagreements, nothing beyond the vigorous interplay of viewpoints was shown here. For example, no dishonesty or fraud by any arbitrator has been suggested, much less demonstrated.

Here the arbitration majority were within their power to rely on the contemporaneous documentation (and the lack of documentation reflecting complete extinguishment of claim) in interpreting the two earlier settlements as something less than absolute. The fact that those two arbitrators gave former Amherst officers Hall and Dupler little or no credibility was well within their ample if not complete discretion as fact finders to do so.

■ Similarly, if the majority arbitrators had made a mistake, it did not rise to a public policy violation. Otherwise, all arbitration errors based on legal or factual errors would become fodder for vacating awards-a result not contemplated by the either the FAA or the cases that have interpreted it. In *Misco,* for example. the Supreme Court rejected a public policy argument for vacating a labor arbitration award reinstating an employee found to have had traces of marijuana in his car and who had been a passenger in another vehicle in which marijuana had been smoked. The arbitrator had found that the employer had not demonstrated that the employee had been smoking marijuana on premises or that his drug association affected his work. The Supreme Court rejected over-

turning the reinstatement of the employee based on a claimed public policy against the operation of dangerous machinery by persons under the influence of drugs. Here there is no supervening public policy principle that is "explicit," "well defined and dominant." or based on "laws and legal precedents" that has been demonstrated to be in conflict with the 2–1 arbitration award. *See Kennecott Utah Copper Corp. v. Becker,* 195 F.3d 1201, 1205 (10th Cir.1999). Alleged misapplication of applicable law to misperceived facts is not enough.

### B. *Damages*

■ Amherst was awarded approximately $5,373,475 out of the nearly $30 million it sought as damages. Of that amount, $2,113,332 was awarded for business impairment, essentially Amherst's claimed inability to maintain its usual margins on freight recovery. The remainder, $4,613,863 was for "large and unexpected expenses to JDE and non-JDE consultants for services devoted to getting OneWorld to function in Amherst's business environment." (Award at 12.) A reduction to the latter amount was made in the amount of $1,353,720 for the expenses Amherst would have expended even if it had taken the "alternate route" of using another vendor.

The damage award is challenged by PeopleSoft because of the interim settlements and also because PeopleSoft asserts the Award allows both restitutionary as well as compensatory damages-a result it claims to be inconsistent or duplicative. As for interim settlements, their limited impact as found by the arbitrators has been discussed and found wanting in justifying vacatur of the liability findings. For the same reasons, it is not a basis for eliminating or reducing the damage award. Even assuming it did not reflect platonic perfection or even legal soundness, the damages

award and the analysis behind it are not so beyond the pale as to warrant federal judicial intervention under the nonstatutory criteria for vacating such an arbitration award.

Similarly, the fact that two types of damages were awarded does not mean that an error, much less a manifest error, occurred. One portion of the damages award was intended to place Amherst in the position it would have been in as to out-of-pocket repair and consultant expenses had the problems with OneWorld not cropped up. That does not necessarily overlap with the compensatory damages of the award for Amherst's lost profits resulting from the problems attributable to JDE's deficient product, representations and assistance.

Moreover, even if there were some overlap or duplication as to damages as claimed, it is certainly not self-evident here and does not warrant withholding confirmation of the award on the ground of "manifest disregard of the law" or "violation of public policy." Both forms of redress were arguably not inconsistent here in order to restore Amherst to where it would have been but for the JDE breaches of duty. Moreover, while the law, of course, does not sanction double recoveries or unjust enrichment, even if such a transgression of general principles occurred here, it does not rise to such a level of severity or obviousness justifying voiding the damages award based on the public policy exception.

## CONCLUSION

For the reasons set forth above, PeopleSoft, Inc.'s Petition to Stay the Execution and Vacate Arbitration Award (Dkt.# 1) is DENIED. Amherst, LLC's Motion to Dismiss PeopleSoft's Petition (Dkt.# 7) and Motion to Confirm the Arbitration Award (Dkt.# 4) are GRANTED. Amherst, LLC shall have interest on the Award based on Colorado's statutory rate from December 20, 2004 through the date of judgment at 8% per annum pursuant to C.R.S. § 5–12–102(1). The Clerk of the Court is directed to enter judgment accordingly and consistent with the parties' stipulation set forth in their Software License, Services and Maintenance Agreement dated July 30, 1998. Art. V, ¶ 9.