**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 3, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

AIR METHODS CORPORATION,

  Plaintiff–Appellant,

v.

OPEIU; OPEIU LOCAL 109,

  Defendants–Appellees.

No. 12-1433

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(1:11-CV-01570-RBJ-KMT)**

---

Raymond M. Deeny (Matthew M. Morrison with him on the briefs) of Sherman & Howard, LLC, Denver, Colorado, for Plaintiff–Appellant.

Todd M. Smith of Schwarzwald McNair & Fusco, LLP, Cleveland, Ohio, for Defendants–Appellees.

---

Before **KELLY, McKAY,** and **MATHESON**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

This case arises out of an arbitration award granted in favor of a helicopter pilot whom Plaintiff Air Method Corporation had terminated following an

incident in April 2010. The pilot, Jeff Stackpole, is a member of Defendant Office and Professional Employees International Union, Local 109 ("OPEIU Local 109"). Mr. Stackpole was represented by OPEIU Local 109 throughout the arbitration process. After the arbitration award was granted in Mr. Stackpole's favor, Plaintiff filed a complaint against Defendants Office and Professional Employees International Union ("OPEIU") and OPEIU Local 109 pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, in the United States District Court for the District of Colorado seeking to vacate the award. On cross-motions for summary judgment, the district court ruled in favor of Defendants, thereby upholding the arbitration award. Plaintiff now appeals the district court's decision.

## BACKGROUND

Plaintiff is engaged in the air transportation business. Its business activities include the use of helicopters to transport medical personnel to accident sites and to transport injured persons from the scene of accidents to medical facilities or between medical facilities. Plaintiff's pilots are represented by Defendants OPEIU and OPEIU Local 109. As an air carrier, Plaintiff is regulated by the Federal Aviation Administration. The FAA requires Plaintiff to comply with FAA certification standards and with all Federal Aviation Regulations. The regulations require that air carriers, such as plaintiff, develop and implement a general operations manual containing policies, procedures, and rules that govern

the carriers' flights. Once an air carrier's general operations manual is approved by the FAA, the carrier's pilots are required to comply with the rules set forth within it as though they were set forth in the Federal Aviation Regulations.

Plaintiff's General Operations Manual explicitly states the pilot-in-command of an aircraft "will not allow persons other than a pilot employed by Air Methods Corp. who is qualified in the aircraft . . . to manipulate the controls of an aircraft during flight." (Appellant's App. at 62.) According to Plaintiff's interpretation of this language, in order to be "qualified" in a specific aircraft, a pilot must be certified to fly a Section 135 flight in that aircraft. A Section 135 flight refers to a flight that is governed by Section 135 of the Federal Aviation Regulations. The primary characteristic of a Section 135 flight is that it includes paying passengers on the flight. In order to become certified to fly a particular aircraft on a Section 135 flight, a pilot must receive a certain amount of aircraft-specific flight training and pass a flight evaluation. Plaintiff does not allow pilots to fly any company aircraft until they are qualified to fly a Section 135 flight, regardless of whether the flight actually includes paying passengers. Rather, it is Plaintiff's policy not to allow a pilot-in-training to operate the controls of a company aircraft unless a designated trainer is present and performing flight training with the trainee.

On April 29, 2010, Mr. Stackpole allowed an unqualified pilot to manipulate the controls of an aircraft during flight and thereby violated Plaintiff's

General Operations Manual. Mr. Stackpole, at the request of one of Plaintiff's certified flight instructors, allowed a pilot-in-training to accompany him on an assignment in a BK-117 helicopter. Mr. Stackpole was not a certified flight instructor. Though the pilot-in-training had experience flying other aircraft and was being trained as a Section 135 pilot on the BK-117, company policy prohibited any pilot-in-command from giving him operational control of a BK-117 because he had not yet completed his Section 135 certification process on this aircraft.

During the assignment, Mr. Stackpole flew the aircraft while traveling to an accident scene and while transporting an injured person to a medical facility. However, Mr. Stackpole allowed the pilot-in-training to take control of the aircraft during various portions of the flight when no paying passengers were aboard. Mr. Stackpole ultimately allowed the pilot-in-training to attempt a landing at Plaintiff's base in Granite City, Illinois. During the landing, the pilot-in-training mishandled the controls, which resulted in the rotor blades hitting the aircraft's wire-strike device. The wire-strike device was damaged, along with all four of the aircraft's rotors. A plexiglass housing atop the aircraft was also damaged. As a result, the aircraft was out of service for approximately one month while Plaintiff made repairs costing around $250,000.

Following an investigation into the incident, Plaintiff determined Mr. Stackpole was the pilot-in-command during the incident and he had relinquished

control of the aircraft to an unqualified pilot. Plaintiff terminated Mr. Stackpole for his actions. In the letter of reprimand informing Mr. Stackpole that he was being terminated, Plaintiff described Mr. Stackpole's actions as "an egregious violation of Company policies and regulations," which amounted to "serious misconduct" that could not be tolerated. (*Id.* at 229-230.)

In accordance with Plaintiff's collective bargaining agreement with Defendants OPEIU and OPEIU Local 109, the Local 109 filed a grievance challenging Mr. Stackpole's termination. After the parties agreed to arbitrate the dispute, a four-day hearing was held before an arbitrator. During the hearing, Mr. Stackpole testified he believed the pilot-in-training was not required to be Section 135 qualified to fly during segments of the flight when no paying passengers were present. In support of this belief, Mr. Stackpole testified the practice of qualified pilots giving "stick time" to pilots-in-training on flights without paying passengers was common practice under the procedures of his former employer, Arch Air Medical, which had been acquired by Plaintiff in 2003 and became subject to Plaintiff's General Operations Manual in 2007.

In the opinion accompanying his award, the arbitrator stated that "[t]he agreed-upon issue in the instant case [was] the question of whether the Company had just cause to terminate [Mr. Stackpole.]" (*Id. at* 78.) The arbitrator concluded Mr. Stackpole had engaged in "misconduct for which some discipline was appropriate." (*Id.*) However, the arbitrator did not agree with Plaintiff's

characterization of Mr. Stackpole's actions as "serious misconduct" that warranted termination. Instead, the arbitrator held that Plaintiff "lacked just cause to terminate [Mr. Stackpole]" under the collective bargaining agreement. (*Id.* at 83.) Consequently, the arbitrator ordered that Plaintiff "promptly offer[ Mr. Stackpole] reinstatement to his former position." (*Id.*) The arbitrator further ordered that Mr. Stackpole "be made whole for all net losses incurred from . . . six months after his termination, to the date he is offered reinstatement if he declines, or the reasonable date fixed for his return to his former position if he accepts." (*Id.*) In so ordering, the arbitrator effectively converted Mr. Stackpole's discharge to a reprimand accompanied by a significant disciplinary suspension.

Plaintiff subsequently filed a complaint in the United States District Court for the District of Colorado seeking to vacate the arbitration award. Plaintiff argued the award should be vacated because it fails to draw its essence from the collective bargaining agreement to which the parties are signatories, it impermissibly imposes the arbitrator's personal brand of industrial justice, and it is contrary to public policy. On cross-motions for summary judgment, the district court ruled in Defendants' favor, thereby upholding the award. The district court concluded that the award "draws its essence from the [collective bargaining agreement], and therefore it must be upheld." (*Id.* at 395 (citing *Chevron Mining Inc. v. United Mine Workers of Am. Local 1307*, 648 F.3d 1151, 1154 (10th Cir.

-6-

2011)).) Furthermore, the district court found the arbitrator did not impose his own brand of industrial justice, and the award did not violate public policy. (Appellant's App. at 396.) Plaintiff now appeals the district court's decision, raising the same three challenges to the arbitrator's ruling that Plaintiff relied on in the district court proceedings.

## DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Local No. 7 United Food & Commercial Workers Int'l Union v. King Soopers, Inc.*, 222 F.3d 1223, 1226 (10th Cir. 2000) (quotations omitted). The standard that courts apply to arbitral awards is "among the narrowest known to the law," since the "parties have contracted for an arbitrator to resolve their disputes, not a court." *LB&B Assocs., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 113*, 461 F.3d 1195, 1197 (10th Cir. 2006) (quotations omitted). As a result, "[w]hether the arbitrator's reading of the agreement was strained or even seriously flawed . . . is irrelevant." *Id.* (alterations in original) (citations omitted). So long as the "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority'" the fact that "'a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.'" *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)).

Of course, an arbitrator's discretion is not unlimited. "'[A]n arbitrator is

confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice'" and "'his award is legitimate only so long as it draws its essence from the collective bargaining agreement.'" *King Soopers*, 222 F.3d at 1227 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 595, 599 (1960)).  However, "[i]n determining whether or not the arbitration award 'draws its essence' from the [collective bargaining agreement], a reviewing court looks to the award itself and not at every phrase contained in the arbitrator's opinion." *Chevron Mining*, 648 F.3d at 1155 (first alteration in original) (internal quotation marks omitted).  "A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award." *Enter. Wheel*, 363 U.S. 593 at 598.

Thus our review is extremely deferential, and it is with this profound deference toward the arbitrator's award that we now consider Plaintiff's appeal.

**I**

First, we consider Plaintiff's argument that the arbitrator's award impermissibly altered or removed language from the parties' collective bargaining agreement contrary to both a provision in the agreement forbidding arbitrators from modifying terms of the agreement and to Tenth Circuit law.  *See King Soopers*, 222 F.3d at 1227 (holding that an award does not draw its essence from a collective bargaining agreement if it is contrary to the express language of the

agreement). Plaintiff argues there are three primary ways in which the arbitrator's award impermissibly alters, ignores, or removes language from the collective bargaining agreement. We find none of these arguments persuasive.

First, plaintiff argues the award failed to consider whether Mr. Stackpole's actions qualified as "serious misconduct" for which "a Pilot may be immediately removed from the payroll and suspended or discharged without pay" under Section 9.6 of the collective bargaining agreement,[1] (Appellant's App. at 2,) instead focusing on the question of whether "just cause" existed to discharge Mr. Stackpole under Section 9.1 of the agreement.[2] We are not persuaded there was any error. First, we note it was the parties who focused the arbitrator's attention on the "just cause" issue rather than the "serious misconduct" provision, and thus any possible error was invited. Moreover, while the arbitrator's opinion did not discuss the term "serious misconduct" in detail, we conclude his "just cause" analysis incorporates consideration of whether the "serious misconduct" contemplated by Section 9.6 was present. For instance, the arbitrator explicitly commented on Plaintiff's statement that Mr. Stackpole engaged in "'serious

---

[1] Section 9.6 states, "A Pilot may be immediately removed from the payroll and suspended or discharged without pay if he violates the FAA Drug/Alcohol policy or commits other acts of serious misconduct." (Appellant's App. at 24.)

[2] Section 9.1 of the parties' collective bargaining agreement states, "Pilots may be subject to disciplinary action, up to and including discharge for just cause including violation or infraction of company rules or policies, or for violating this Agreement. The Company will continue to use a system of progressive discipline. . . ." (Appellant's App. at 23.)

misconduct' that represented a 'willful disregard for the [General Operations Manual], and applicable [Federal Aviation Regulations], [and] the mutually agreed upon language of the Collective Bargaining Agreement,'" deciding that this was not an "accurate characterization[] of [Mr. Stackpole's] violation." (*Id.* at 80 (third alteration in original).) While the arbitrator characterized Mr. Stackpole's violation as "misconduct for which some discipline is appropriate," he did not identify the violation as serious misconduct. (*Id.* at 78.) Furthermore, Section 9.6 does not mandate discharge even for acts of "serious misconduct" but rather permits the imposition of suspension as an alternative penalty. Consequently, the arbitrator's substitution of a suspension for a discharge was a permissible interpretation of Section 9.6's "serious misconduct" provision in conjunction with Section 9.1's "just cause" provision and the same section's statement of a commitment to progressive discipline. *See Chevron Mining*, 648 F.3d at 1155 (holding that when provisions "simply provide that violations may be grounds for termination, one can contemplate circumstances where noncompliance with the Rules, subjec[ting an] employee to corrective action up to and including discharge, would nevertheless fall short of the just cause required for termination by the [collective bargaining agreement]" (quotations omitted)). In a case such as this, in which an arbitrator determines a discharge is not permissible under a collective bargaining agreement that allows discipline up to and including discharge for certain behavior, "[w]e need not comment on whether

this is the best construction of the [collective bargaining agreement]; but we do conclude the arbitrator's decision was drawn 'from the essence' of its terms." *Id.* Therefore, we hold the arbitrator's award does not ignore or remove the "serious misconduct" provision from the collective bargaining agreement in a manner that precludes the award from drawing its essence from that agreement.

Second, Plaintiff argues the arbitrator's award impermissibly alters the collective bargaining agreement to require a pilot to engage in "willful and egregious" misconduct before he will be subject to immediate discharge. We have previously held that "[t]he interpretation of just cause to require a prerequisite . . . before termination is allowed draws its essence from the [collective bargaining agreement]." *Id.* at 1155-56 (first alteration in original) (quotations omitted). However, Plaintiff argues the arbitrator has not simply added a prerequisite to the just cause provision of the collective bargaining agreement, but has rather replaced the "serious misconduct" provision with a provision requiring "willful and egregious" behavior before a pilot can be subject to discharge.

The arbitrator seems to have taken the words "willful" and "egregious" from Plaintiff's termination notice to Mr. Stackpole and from Plaintiff's response to the Union's grievance. In these documents, Plaintiff stated that Mr. Stackpole was discharged for an "egregious violation of Company policies and regulations" and for "willful disregard for the [General Operations Manual and] applicable

-11-

[Federal Aviation Regulations]." (Appellant's App. at 230, 233.) Plaintiff attacks the arbitrator for looking to these sources in his effort to interpret "just cause" and "serious misconduct." However, the "the correctness of a discharge must stand or fall upon the reason given at the time of discharge." *Misco*, 484 U.S. at 40 n.8 (quotations omitted). The arbitrator was acting well within the scope of his authority when he looked to the reasons given for Mr. Stackpole's discharge in his effort to interpret the contractual provisions concerning the discharge of pilots. His use of the phrase "willful and egregious" in his analysis of whether just cause existed for Mr. Stackpole's discharge does not impermissibly read additional terms into the collective bargaining agreement. Instead, the arbitrator simply fulfilled his responsibility to interpret the collective bargaining agreement.

Third, Plaintiff argues the arbitrator impermissibly ignored Section 37.3 and effectively removed it from the collective bargaining agreement, with the result that his award was contrary to the express language of the agreement. Section 37.3 states, "[t]he parties agree that any past practices established prior to the date of this Agreement shall not create any contractual or legal obligation to continue such practices following the effective date of this Agreement." (Appellant's App. at 40.) Plaintiff argues the arbitrator's consideration of the past practices of Arch Air Medical to determine whether Mr. Stackpole's misunderstanding of Plaintiff's policy was sincere and reasonable effectively

-12-

created a contractual and legal obligation for Plaintiff to always consider whether prior company practices immunize a pilot from discharge prior to imposing discipline. However, as the district court noted, "Section 37.3 does not bar any consideration of past practices; it merely states that past practices do not create any legal or contractual obligations." (*Id.* at 394.) The arbitrator did not find that Plaintiff was bound by Arch Air Medical's past practices to allow unqualified pilots to fly its aircrafts. Instead, the arbitrator considered Mr. Stackpole's explanation for his actions in determining whether just cause existed to discharge him. An award allowing such consideration, even if it allows a review of a pilot's understanding of past company practices, does not create new contractual obligations and certainly does not preclude the award from drawing its essence from the collective bargaining agreement.

Thus we conclude that none of the alleged alterations or omissions of the collective bargaining agreement rendered the arbitrator's award contrary to the express language of the collective bargaining agreement, nor did they violate the agreement's proscription against modifying its terms. At most, Plaintiff's allegations show "mere ambiguity in the opinion accompanying the award," "not a reason for refusing to enforce the award." *Enter. Wheel*, 363 U.S. at 598. Therefore, the arbitration award draws its essence from the collective bargaining agreement and must be upheld. *King Soopers*, 222 F.3d at 1227.

## II

Second, we consider Plaintiff's argument that the arbitrator imposed "his own brand of industrial justice," *Enter. Wheel*, 363 U.S. at 597, through the arbitration award. Plaintiff argues the arbitrator "'intentionally disregarded and thus violated the clear, specific language of the contract, and created an escape hatch through which he could dispense his own brand of industrial justice.'" (Appellant's Opening Br. at 34 (quoting *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133, 1145 (7th Cir. 2002)).) Plaintiff argues the arbitrator ignored and altered five types of provisions in order to impose his personal brand of industrial justice. Specifically, Plaintiff claims the arbitrator impermissibly altered or ignored provisions that:

> (1) allowed the Company to terminate Stackpole for serious misconduct, (2) required Stackpole to comply with all Company rules and policies, such as the [General Operations Manual], (3) required Stackpole to comply with all applicable [Federal Aviation Requirements], (4) prohibited past practices from imposing any contractual or legal obligations on the parties, and (5) prohibited any arbitrator from modifying, adding to, or otherwise altering or amending any of the terms of the Agreement.

(Appellant's Opening Br. at 33-34.)

For the reasons discussed above, we conclude the arbitrator did not alter or ignore the first, fourth, and fifth types of provisions listed by the Plaintiff. We also conclude the award gives no indication that the arbitrator altered or ignored the second and third types of provisions—those requiring Mr. Stackpole to comply with company rules and policies, such as the General Operations Manual,

and with the Federal Aviation Requirements. Indeed, the arbitrator enforced such provisions. The arbitrator found Mr. Stackpole had violated a company policy, which was found in the General Operations Manual and was closely related to Federal Aviation Regulations, and subjected him to a six-month suspension without pay as a result. Therefore, Plaintiff's argument that the arbitrator ignored provisions requiring pilots to comply with company rules and policies and the Federal Aviation Regulations lacks merit.

The arbitrator did not alter or ignore any provisions of the collective bargaining agreement. Consequently, he did not "'stray[] from interpretation and application of the agreement and effectively dispense[] his own brand of industrial justice.'" *San Juan Coal Co. v. Int'l Union of Operating Eng'rs, Local 953*, 672 F.3d 1198 (10th Cir. 2012) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)). We therefore affirm the district court's conclusion that the arbitrator did not circumvent the collective bargaining agreement to impose a personal brand of industrial justice.

### III

Finally, we consider Plaintiff's argument that the arbitrator's award violated a clear public policy. Defendants urge us to hold that the Railway Labor Act does not permit parties to challenge arbitration awards on public policy grounds. (*See* Appellee's Br. at 49-50 (citing *Bhd. of Maintenance of Way Emps. v. Denver & R.G. W. Ry.* Co., 963 F. Supp. 946, 949 (D. Colo. 1997)).) However,

-15-

we do not need to decide this issue because we hold that the arbitrator's award in this case did not violate public policy. For an arbitration award to violate public policy, "[t]he policy involved must be an 'explicit public policy' that is 'well defined and dominant,' and is . . . ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" *Kennecott Utah Copper Corp. v. Becker*, 195 F.3d 1201, 1205 (10th Cir. 1999) (quoting *W.R. Grace & Co. v. Int'l Union of Rubber Workers,* 461 U.S. 757, 766 (1983) (second alteration in original)). The public policy rationale for refusing to enforce an arbitration award is "a limited exception" in which "we ask only whether the award itself (i.e. reinstatement), and not the underlying reasons for the award, violate[s] public policy." *Id.*

Plaintiff argues that a clear public policy favoring air carrier safety has been recognized in 49 U.S.C. § 44701(d)(1), which acknowledges "the duty of an air carrier to provide service with the highest degree of safety." *See also* 49 U.S.C. § 44702(b). In further support of a public policy favoring air carrier safety, plaintiff cites a string of cases from other circuits in which this general policy is recognized. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l* 861 F.2d 665, 672-674 (11th Cir. 1988); *Robinson v. American Airlines, Inc.*, 908 F.2d 1020, 1023 (D.C. Cir. 1990); *World Airways, Inc. v. Int'l Bhd. of Teamsters*, 578 F.2d 800, 803 (9th Cir. 1978). Plaintiff also cites federal regulations regarding pilot competency and qualifications in support of this general policy. *See* 14

C.F.R. §§ 121.143(c)(4)(ii) and 135.115. However, we are not persuaded any of the authorities cited by Plaintiff demonstrates a clear public policy that prohibits the reinstatement of an employee in Mr. Stackpole's circumstances.

While Plaintiff establishes a general policy of air carrier safety, "a general public policy is not enough—there must be a showing of a specific public policy that would be violated by this award." *Kennecott*, 195 F.3d at 1206. The statutes, cases, and regulations cited by the Plaintiff do not suggest that every pilot who violates a provision of a company's general operations manual or the Federal Aviation Regulations must be fired, nor do they suggest that a pilot, once fired for such a violation, cannot be reinstated. *See id.* Indeed, the parties' collective bargaining agreement contemplates discipline less severe than discharge for violations of company policy and federal regulations. In short, Plaintiff cites to no precedent indicating there is a specific public policy against reinstating someone in Mr. Stackpole's circumstances.

Moreover, "some deference to the arbitral process must inform our judgment whenever it is suggested that public policy prohibits enforcement of the award that is the product of the parties' agreement." *Id.* at 1207. "We must be cautious of displacing the written agreement based upon general public policy concerns because 'parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored.'" *Id.* (quoting *W.R. Grace*, 461 U.S. at 771). By striking down an arbitrator's award on ill-defined

public policy grounds, we run the risk of violating the explicit public policy in support of parties' ability to rely on their collective bargaining agreements. Additionally, "determining public policy is a uniquely legislative endeavor, one not well suited to judicial resolution," and therefore "[w]e must be cautious of substituting our preferences in lieu of contractual commitments of the parties under the guise of enforcement of public policy." *Id.* Therefore, in the absence of a clearly defined public policy which would prohibit the arbitrator's award, we will not disrupt the results of an arbitration award that draws its essence from a collective bargaining agreement. We accordingly conclude the district court did not err in holding that the arbitrator's award did not violate a clear public policy.

## CONCLUSION

For the foregoing reasons, the decision of the district court is **AFFIRMED**.